UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TANIA BRAVO GILES, | |
| Petitioner, | Case No. 2:11-cv-01600-PMP-CWH |
| vs. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| ROGELIO SANVICENTE BRAVO, *et al*, | |
| Respondents. | Petition for Judicial Review (# 1) |

This matter comes before the Court on Plaintiff's Petition for Judicial Review pursuant to the Hague Convention and the International Child Abduction Remedies Act (#1), filed on October 5, 2011.

A. **BACKGROUND**

Plaintiff served her Petition on October 18, 2011. After more than 21 days passed since service of the Petition with no response, the Court issued a notice of hearing to show cause why the Respondents had failed to answer. Respondent Rogelio Sanvicente Bravo then appeared at the hearing on November 29, 2011 along with the Child. Respondent orally refuted Petitioner's claims and indicated that he was in the process of obtaining counsel. The Court advised Respondent that he should obtain counsel and attend a status hearing with his attorney. The Court further ordered that the Respondents not remove the child from the State of Nevada during the pendency of this action unless prior court approval has been obtained.

The Court held a status conference on December 9, 2011. Both Respondents appeared at the hearing, and again the child was in attendance. Respondents informed the Court that they were unable to procure counsel to defend the Petition due to their inability to pay. Respondents again represented that Petitioner's allegations were false. This time, in support, Respondents admitted evidence of a letter

issued by the Consul of the United States of America at Mexico, Federal District ("D.F."). wherein Petitioner granted Respondents permission to travel with the child from July, 2010 until the year 2015. Further, Respondents submitted an Order Granting Guardianship of the child to them in the Eighth Judicial District of Nevada dated February 10, 2011.

Because of the significant factual issues that developed from the representations of Respondents, the Court determined that appointment of counsel was necessary in this matter. The Court again ordered that the Respondents not remove the child from the State of Nevada until the proceedings are resolved. The Court noted the child's school enrollment and attendance. The Court determined that the safety of the child is not in jeopardy and allowed her to remain in the Respondents' home pending the outcome of this proceeding.

Petitioner's counsel was instructed to notify the Court when the Petitioner would be available to travel to the United States to testify. In the interim, the Federal Public Defender was assigned to represent the Respondents.

After several weeks with no contact from Petitioner's counsel, the Court set a status hearing in this matter. Subsequently, Petitioner's counsel notified the Court that Petitioner would be present at the status hearing. Thus, the status hearing set for January 11, 2012 ultimately became an evidentiary hearing in order to expedite the matter.[1]

B.  **FINDINGS OF FACT**

Petitioner was born in Mexico City. Her parents, Rogelio Sanvicente Bravo and Eva Rodriguez Giles (the Respondents), illegally transported her to the United States at the age of three.[2] Petitioner became pregnant with the subject child at the age of 15 while living with Respondents.[3] Petitioner lived

---

[1] Testimony was given by Petitioner Tania Bravo Giles, the child, and Respondent Eva Rodriguez Giles.

[2] Petitioner alleges that she had a difficult upbringing and described two occasions where her parents emotionally and physically abused her during her early teenage years.

[3] Respondent Eva Rodriguez Giles took Petitioner to the doctor. Petitioner testified that her mother advised her to not have the baby, however, Respondents ultimately aided Petitioner financially during her pregnancy and were present at the child's birth.

in Respondents' home with her child after the birth. Petitioner testified that her father took care of the baby during the night. After several months, Petitioner agreed to leave the child with Respondents while she cohabited with her boyfriend. She testified that she routinely visited the child. Petitioner's paternal grandmother advised her at this time that Respondents wished to obtain custody over the child.

Petitioner then attempted to remove the child from Respondents' home, but her testimony was unclear whether Petitioner was successful, or for how long. Petitioner testified that she did take the child without her belongings, but then stated that she could not keep the child because her parents threatened to notify Social Services that Petitioner was unemployed. Petitioner further testified that around this time, Respondent Rogelio Bravo told her he would "follow up" with her immigration case, which would allow her to legally remain in the United States, in exchange for custody of the child.

The child remained with Respondents. At some point during the next two years, Petitioner became pregnant with her second child, and married a man named Vladimir.[4] Petitioner and Vladimir moved back into Respondents' home. Petitioner testified that in 2007 Vladimir witnessed Respondent Eva Rodriguez Giles refer to the Petitioner as "Tania" instead of "your mom" when speaking to the child. This comment upset Vladimir, causing him and Petitioner to decide to take the child and relocate. While there was conflicting testimony on whom to place blame, a physical altercation between Vladimir and Respondent Rogelio Bravo occurred. Petitioner and her family soon relocated to another home in Las Vegas and in 2008, Petitioner decided to move with her young family to Mexico where her husband had obtained employment. Petitioner testified that the child thrived in Mexico and enjoyed her life.

In May 2010, Petitioner notified her mother that Vladimir had abused her, threatened to take the children, and kicked her out on the street.[5] Respondents gave Petitioner money in order to travel to the

---

[4]Vladimir is not the biological father of the subject child.

[5]Petitioner informed Respondents on a fairly frequent basis that Vladimir abused her beginning in November 2008. Petitioner testified that while he did hit her in May of 2010, there was no further abuse and that she lied in order to obtain money from Respondents.

3

D.F. in Mexico. While there, Petitioner stayed with her maternal grandmother. Respondents traveled to Mexico to meet with Petitioner and the child. The following month, Petitioner began the process to obtain a passport for the child. In addition, Petitioner signed a travel authorization that gave her consent for the child to travel between Mexico and the United States with Respondents over a period of five years. Respondent Eva Rodriguez Giles testified that Petitioner told her that she wanted the child to have more opportunity and to study in the United States and learn English, as had Petitioner. Petitioner maintains that she believed the sole reason for the child's visit to the United States was for medical treatment.[6]

Sometime after Petitioner initiated the travel process to allow the child to travel to the United States with Respondents, Vladimir traveled to the D.F. and attempted to thwart the child's international trip with Respondents. Specifically, Petitioner testified that Vladimir warned her that Respondents were tricking her in order to obtain custody of the child, but Petitioner stated that she trusted her parents and still planned on the child traveling to the United States with Respondents.

Vladimir presumably voiced his concerns to Respondents, as Petitioner testified that Respondent Eva Rodriguez Giles stated "if anyone tries to stop me from taking the girl I will shoot them." Petitioner left her grandmother's home for a few days, but the child remained. It is unclear where the Petitioner was located during this time.

On July 20, 2010 Petitioner received a phone call from Respondent Eva Rodriguez Giles, who informed Petitioner that the child was in Las Vegas, Nevada with her. Petitioner reacted angrily at the fact that she was unable to bid farewell to the child. Petitioner then talked with her child, but when Vladimir began talking with the child, Respondent Giles retrieved the telephone and ended the call.[7]

On September 9, 2010 Petitioner filed a petition with the Mexican Central Authority under the Hague Convention, reporting that the child had been wrongfully removed from Mexico. Sometime in December 2010, Petitioner obtained Respondents' telephone number from a cousin in Las Vegas.

---

[6] The child has one "lazy eye" that has been present since an early age.

[7] Respondent testified that she ended the call because she believed that Vladimir had abused the child.

Petitioner contacted Respondents who informed her that they would not be bringing the child back to Mexico.

On February 8, 2011 the District Court for the Eighth Judicial District, located in Clark County, Nevada, granted Respondents petition for guardianship of the child.[8] Petitioner initiated the instant action on October 5, 2011. The child in question is currently seven years old.

## DISCUSSION

"The Hague Convention is a multilateral international treaty on parental kidnapping." *Holder v. Holder*, 305 F.3d 854, 859 (9th Cir. 2002). The United States and Mexico are both signatories to the treaty. The Convention was enacted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Hague Conv., Oct. 25, 1980, preamble.

### I. Jurisdiction

Any person seeking the return of a child in the United States may commence a civil action under the Convention by filing a petition in the court of the jurisdiction in which the child is located. 42 U.S.C. § 11603(b).

The child in this matter was removed from Mexico to the United States. She is now seven years old, within the age range of the Convention. Hague Conv., art. 4. Thus, this Court is an appropriate judicial authority to render a decision in this case. *Id*. art. 11.

### II. Wrongful Removal and Retention

The removal or the retention of a child is to be consideration wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

---

[8]Petitioner testified that she had no knowledge of the state court guardianship proceedings. The application reflects that it was mailed to the address of Petitioner's maternal grandmother, where Petitioner was living at the time Respondents left Mexico in the summer of 2010. However, there is no proof of service and therefore the Court cannot impute knowledge to Petitioner regarding the proceeding.

    b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*See Mozes v. Mozes*, 239 F.3d 1067, 1069-70 (9th Cir. 2001) (citation omitted).[9]

  Petitioner has the burden of proving the exercise of custody rights by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A). Under Mexican law, "[t]he exercise of parental authority . . . gives rise to a duty of custody and care." Patricia Begné, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527, 534 (2005).

  Further, the Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott v. Abbott*, 130 S. Ct. 1983, 1990 (2010) (quoting Hague Conv., art. 5(a)). Whether a parent was exercising her custody rights has been liberally construed to include whenever a parent "keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996).

  The child lived with Petitioner for around two years in Mexico prior to the removal. Petitioner presented a receipt of student enrollment showing that in February 2010 she had registered the child in preschool in Mexico for the 2010-2011 school year. A few months prior to removal, in May 2010, Petitioner relocated the child from Sonara to the D.F. in Mexico. The child was in Petitioner's custody and she was caring for the child.[10] After Respondents arrived in Mexico, Petitioner signed a travel document, applied for the child's passport, and made copies of the child's birth certificate available to Respondents. Specifically, the travel authorization signed by Petitioner gave the Respondents

---

[9] The parties do not dispute that the subject child was habitually residing in Mexico until her removal to the United States. Thus, Mexican federal law governs with respect to the scope of Petitioner's custody rights for Convention purposes. *See A.A.M. v. J.L.R.C.*, No. 11-CV-5732, 2012 WL 75049, at *9 (E.D.N.Y. Jan. 9, 2012).

[10] Respondent Eva Rodriguez Giles testified that when she arrived in Mexico, the child had no shoes and appeared malnourished. Respondent Giles further stated that the child told her grandmother that she went without food and water sometimes for an entire day. Petitioner disputes this testimony, and stated that the child was provided adequate nutrition. Regardless, "[o]nce it determines the parent exercised custody rights in any manner, the court should stop - completely avoiding the question whether the parent exercised the custody rights well or badly." *Friedrich*, 78 F.3d at 1066.

1  permission to travel between Mexico and the United States with the child.  Although the authorization
2  was effective for five years, Petitioner testified that she gave permission only for Respondents to take
3  the child to the United States in order to seek medical treatment, not to remain with the child in the
4  United States forever.[11]  Petitioner stated that she was not distressed by the fact that the child was taken,
5  but rather that she did not have a chance to say good-bye.

6       Based on these facts, the travel authorization did not relinquish Petitioner's custody rights.  *See*
7  *Muhlenkamp v. Blizzard*, 521 F.Supp.2d 1140, 1150 (E.D. Wash. 2007)(permission to travel did not
8  relinquish custodial rights).   The Court finds that Petitioner was exercising her custody rights in
9  Mexico, where the child habitually resided, at the time of the child's removal to the United States on
10  about July 20, 2010.  Although the removal in July 2010 appears to have been with the consent of
11  Petitioner, the subsequent retention of the child in this case was wrongful, and breached the rights of
12  custody attributed to Petitioner under Mexican law.  *See Muhlenkamp,* 521 F.Supp.2d at 1149.

14     **III. Affirmative Defenses**
15       Once a petitioner establishes that removal was wrongful, the child must be returned unless the
16  respondent can establish one of four defenses:   (1) by a preponderance of the evidence that the
17  proceeding was commenced more than one year after the removal of the child and the child has become
18  settled in her new environment; (2) by a preponderance of the evidence that the person seeking return of
19  the child consented to or subsequently acquiesced in the removal or retention; (3) by clear and
20  convincing evidence that there is a grave risk that the return of the child would expose it to physical or
21  psychological harm; and (4) by a preponderance of the evidence that the return of the child would not
22  be permitted by the fundamental principles of the requested State relating to the protection of human
23  rights and fundamental freedoms.  *See* Hague Convention, Arts. 12-19.  Respondents assert that the first
24  three of these defenses are applicable in this case.

25     **A.**     **Whether the petition was filed more than one year after the child's removal and the**

---

[11] Petitioner credibly testified that she executed a five year permission form in order to avoid the need to obtain a similar formal document in the future.

        **child is now settled.**

If the petition was filed one year from the time of the alleged wrongful retention and the child has since settled into the new environment, then the Court must not order the return of the child. Hague Conv. art. 12. The petition in this case was filed on October 5, 2011. "The one year limit runs when the petitioner should have known of the wrongful removal or retention." *See Muhlenkamp,* 521 F.Supp.2d at 1151 (citing *Furnes v. Reeves*, 362 F.3d 702, 723 (11th Cir. 2004)). Petitioner would have the one year time line begin to run in December 2010 because she testified that is when she first became aware, through a telephone call, that Respondents did not intend to return the child to Mexico.

This assertion is not supported by the evidence. Petitioner initiated a Hague Convention proceeding with the Mexican Central Authority on September 9, 2010 by filing a detailed claim that the child had been wrongfully removed from Mexico. Petitioner testified that she filed the petition out of caution and because she was angry with her mother, but that she still believed Respondents would return the child.

Petitioner's September 9, 2010 filing, however, states the following: "I have been threatened more than once by my parents saying they would take my daughter [Child's Name Stated] away from me. I was threatened by my parents that if I or anyone tryed (sic) to stop them frome (sic) taking [Child's Name Stated] to Las Vegas N.V. they would get a gun and shoot them."[12] These statements support a finding that in July, 2010, Petitioner believed, and was on notice, that Respondents intended to take the child and would likely not return her unless required by force. By September 2010, when Petitioner filed her complaint with the Authority, and Petitioner had had no contact with Respondents, it seems clear that Petitioner was on notice that her child was being retained by Respondents. Regardless of any misunderstanding there may have been between Petitioner and Respondent regarding the original removal of the child from Mexico by July 20, 2010, the court finds that the wrongful retention of the child began no later than September 9, 2010 when Petitioner lodged her complaint with

---

[12] Petitioner also testified that Respondent Eva Rodriguez Giles made these statements on July 1, 2010.

the Mexican Authority.[13]

The Court must then determine whether the child is now well-settled in her current environment. Respondents must show by a preponderance of the evidence that the child is "in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects . . . [T]here must be 'substantial evidence of the child's significant connections.'" *In re Robinson*, 983 F.Supp. 1339, 1345 (D.Colo. 1997) (quoting Public Notice 957, 51 Fed.Reg. 10,494, 10,509 (1986)).

Among the factors that courts have considered when determining whether a child is well-settled are the amount of time that has passed since the child's removal and the age of the children. *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1348 (S.D. Fla. 2002). Additional factors are "the circumstances surrounding the Children's living environment; the stability of the Child's residence in his/her new environment; social ties with family and friends; and attendance at school and other social institutions such as religious institutions." *Gonzalez v. Nazor Lurashi*, No. Civ. 04-1276 (HL)(D. Puerto Rico May 20, 2004).

The child currently lives in their Las Vegas home with the Respondents. Respondents lived in the same location for several years until recently moving to a smaller home to downsize financially. Respondents have cared for the child for extended periods of time throughout her life. Petitioner lived with Respondents after the child's birth, and testified that Respondents took care of the child. Petitioner further testified that when she lived in Las Vegas, she moved in with her boyfriend and left the child with Respondents at their home. Petitioner agreed the child was safer with Respondents than with Petitioner and her then-boyfriend when she lived in Las Vegas. The child has a close relationship with her grandparents, having lived in their home for a majority of her life. No other family members

---

[13] Petitioner did not commence her proceeding when she contacted the Mexican Authority. Under Article 12 of the Convention, the term "commencement of proceedings" means the filing of a petition in any court which has jurisdiction of the action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed. *See Wojcik v. Wojcik*, 959 F.Supp. 413, 418 (E.D. Mich. 1997) (citing 42 U.S.C. § 11603(f)(3); 42 U.S.C. § 11603(b)). Thus, Petitioner commenced the proceeding on October 5, 2011 by filing a petition with this Court.

reside in the area.[14] Respondents represented to the Court that the child attended kindergarten last year and that she is currently in the first grade and attends school regularly. While the child initially struggled with the English language, Respondents stated that she now understands English well and speaks some English. The child testified that she enjoyed school. In fact, the majority of the child's testimony before the Court was spoken in English with out the assistance of a translator.

Additionally, by obtaining legal guardianship over the child, Respondents are able to make decisions regarding the child's education and welfare, and have apparently done so by ensuring the child is enrolled in, and attending school. Through the child's testimony and the Court's observations of the child, it appears, and the court finds, that the child is stable in her current environment, and it is reasonable to infer that given the passage of time and events, and a return to Petitioner would be disruptive to the child.

### B. Whether Petitioner consented to, or subsequently acquiesced in, the removal or retention.

As discussed above, it appears that Petitioner gave permission for the child to travel to the United States with Respondents despite the fact that they had made it abundantly clear that they wished to raise the child and remove her from Petitioner's care. Petitioner testified that she believed Respondents took the child for the sole purpose of receiving medical treatment.[15] However, Petitioner placed no restrictions on the right to travel at the time she filled out the authorization and obtained a passport for the child, there were apparently no discussions regarding when the child would return, and Petitioner clearly intended the child to travel with Respondents in the future because she completed a five year authorization for travel.

---

[14] Upon the Respondents' belief, the child's biological father does reside in Las Vegas, Nevada. However, Petitioner did not receive child support from the father, and he did not have a role in the child's life prior to her moving to Mexico. Respondents indicated that they wished to notify the father and establish a relationship between him and the child, but at this time no relationship exists.

[15] Petitioner testified that although optometrists were available in the D.F., she never took the child to receive treatment for the condition.

The only evidence indicating that Petitioner intended that the child return to Mexico is a document purporting to enroll the child in school for the 2010-2011 school year.  However, Petitioner testified that she obtained the enrollment in February 2010, prior to the incident with her husband that led Petitioner to contact her parents and travel with the children to meet them in the D.F.  Based on this evidence, the Court finds that Petitioner consented to the removal of the child from Mexico to the United States.

Even if Petitioner had not consented to removal, she subsequently acquiesced to retention of the child in the United States.  Acquiescence under the Convention has been interpreted to require either: "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; <u>or a consistent attitude of acquiescence over a significant period of time.</u>" *Friedrich*, 78 F.3d at 1070 (citations omitted) (emphasis added).

Despite the fact that Petitioner filed a petition for the child's return with Mexican authorities, Petitioner made no effort to locate the child.  Petitioner even claimed that she filed the petition in retaliation of Respondents taking the child without allowing Petitioner to say goodbye, not to reclaim custody of the child.

Petitioner's argument that Respondents concealed the child is without merit.  Respondents removed the child to Las Vegas, the same city that Petitioner had lived in for over ten years.  Petitioner listed the address for Respondents in her complaint to the Mexican Authority as well as her complaint in this case.  Respondents moved once, prior to the filing of the instant petition.  Petitioner was able to serve the Petition on Respondents within two weeks of it being filed.

Further, Petitioner admitted she had personal contacts in Las Vegas with knowledge of how to reach the Respondents.  Petitioner's telephone call with Respondents in December 2010 was the result of Petitioner's cousin providing her with the telephone number.  Petitioner testified that she did not call her cousin earlier because they were on bad terms and her cousin might refuse.  This testimony shows that Petitioner was not eager to attempt to reach Respondents or her child.  Petitioner also had access to her grandmother in Mexico who had a close relationship Respondents and knew their contact information, but made no effort to reach Respondents through her.

As noted *supra*, it took Petitioner over one year to take proper legal action in the country where she knew the child was located. The Court finds that Petitioner exhibited a consistent attitude of acquiescence over a significant period of time.

    **C.    Whether, by clear and convincing evidence, there is a grave risk that the return of the child would expose it to physical or psychological harm**.

The Respondents' arguments with regard to this exception are: (1) that the child was subjected to physical abuse from Petitioner's husband in Mexico; and (2) that the child was malnourished and improperly clothed while in Petitioner's care.

Petitioner's mother testified that she received countless telephone calls and text message from her daughter describing abuse by Vladimir, Petitioner's husband. Petitioner testified that she lied to her mother regarding the abuse in order to obtain sympathy and money.

When pressed further, Petitioner admitted that her husband had physically abused her on one occasion during an argument because she became aggressive. Petitioner moved out of her home of two years and relocated the children to the D.F. in response to this incident. Petitioner denies that any abuse toward the child occurred, other than spanking when the child was disrespectful. There is no evidence that the incident between Petitioner and her husband occurred in front of the child.

Testimony at the evidentiary hearing indicated that Petitioner's husband might have abused the child. The child testified before the Court and credibly described the incident as "spanking" and "hitting." She referenced one incident of spanking with a belt and stated that her mother was present, but did nothing to stop her husband. Respondent Eva Rodriguez Giles corroborated the child's version of events by recalling the child's statements upon her arrival to the United States. Respondent Giles further testified that Petitioner told her in December 2009 and again in May 2010 that Vladimir abused the child. Respondents never witnesses any physical abuse by Vladimir during the time that he lived in their home with the child. No reports of abuse were made to police authorities. Further, no medical evidence reflecting abuse was presented. Based on the evidence before the Court, there does not appear to be a "sustained pattern of physical abuse" sufficient to support a "grave risk" finding. *See Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007) (citations omitted).

Similarly, the issue of whether the child was malnourished is presented with conflicting

testimony and a lack of medical evidence. Respondent Eva Rodriguez Giles stated that when she arrived in Mexico a few months prior to removal, the child was not wearing shoes and that she weighed 25 pounds at the age of five years and four months. Respondent Giles further stated that Petitioner requested financial aid from Respondents in order to purchase food for the children. Respondent also testified that the child told Respondents that she went without food and water for hours or even days. The child did not provide testimony on this issue. Petitioner testified that she had ample funds to support the children. This evidence does not establish a grave risk under the clear and convincing standard.

Based on the foregoing, the Court finds that Respondents' evidence of abuse does not satisfy the clear and convincing standard required for a showing of grave risk.

## CONCLUSION

Though finding that the retention of the child was wrongful under the Convention, the Court is not mandated to return the child to her habitual residence when affirmative defenses are established. Of the three affirmative defenses asserted by Respondents, the Court has determined that two of these defenses have been established under the proper standard. Thus, it is the finding of the undersigned that the child should not be returned to Mexico pursuant to the Hague Convention, and Petitioner's recourse lies with a Court having jurisdiction over custody proceedings.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Return of Child be **DENIED** and that the child remain with Respondents in the United States.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and

brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 27th day of January, 2012.

_____
**C.W. HOFFMAN, JR.**
**UNITED STATES MAGISTRATE JUDGE**